United States District Court

For The

Baltimore District of Maryland

| | |
|---|---|
| Shalelah Cook, Plaintiff | ) |
| 9511 Oaktrace Way | ) |
| Randallstown, Maryland 21133 | ) |
| | ) |
| v. | ) Civil Action No. RDB 14-cv-17776 |
| | ) |
| National Center Institution Alternatives, | ) |
| LLC, Defendant | ) |
| Serve: Kirk Larter, Resident Agent | ) |
| 7222 Ambassador Road | ) |
| Baltimore, Maryland 21244 | ) |
| | ) |
| James Hack, Defendant | ) |
| 7222 Ambassador Road | ) |
| Baltimore, Maryland 21244 | ) |
| | ) |
| Walter Billips, Defendant | ) |
| 7222 Ambassador Road | ) |
| Baltimore, Maryland 21244 | ) |
| | ) |
| Jayne Gessner, Defendant | ) |
| 7222 Ambassador Road | ) |
| Baltimore, Maryland 21244 | ) |
| | ) |
| Rodney Norris, Defendant | ) |
| 7222 Ambassador Road | ) |
| Baltimore, Maryland 21244 | ) |
| | ) |
| Larry Norris, Defendant | ) |
| 7222 Ambassador Road | ) |
| Baltimore, Maryland 21244 | ) |
| | ) |
| Herbert J. Hoelter, Defendant | ) |
| 7222 Ambassador Road | ) |
| Baltimore, Maryland 21244 | ) |

FILED _____ ENTERED
_____ LODGED _____ RECEIVED

JUN 2 2014

AT BALTIMORE
CLERK U.S. DISTRICT COURT
DISTRICT OF MARYLAND
NIGHT DROP BOX

BALTIMORE-NIGHT BOX
2014 JUN -2 PM 6: 08
U.S. BANKRUPTCY COURT
DISTRICT OF MARYLAND

1

## Complaint and Jury Trial Prayer

NOW COMES, Shalelah Cook, "Plaintiff," by and through her attorneys, Jessie Lyons Crawford, Esquire and the Law Offices of Jessie Lyons Crawford, LLC, and hereby sues the above-captioned Defendants. In support thereof states:

### Parties

1.   Plaintiff, Shalelah Cook is a citizen of the United States and resides in Baltimore County, Maryland. At all times relevant herein, Plaintiff was an employee of National Center Institution Alternatives, LLC.

2.   Defendant National Center Institution Alternatives, LLC, hereinafter NCIA, is a limited liability company organized and existing under the laws of the State of Maryland, with its principal place of business in Baltimore County, Maryland. NCIA is a major service company that provides treatment and services to intellectual and emotionally disabled youths, adults and those involved in the criminal justice system. On information and belief, NCIA employs more than 15 employees for each working day in each of twenty or more calendar weeks in the current or preceding calendar year.

3.   Defendant James Hack, hereinafter Defendant Hack, is a citizen of the United States and works in Baltimore County, Maryland. At all times relevant herein, Defendant Hack was an employee of NCIA.

4.   Defendant Walter Billips, hereinafter Defendant Billips, is a citizen of the United States and works in Baltimore County, Maryland. At all times relevant herein, Defendant Billips was an employee of NCIA.

2

5.   Defendant Jayne Gessner, hereinafter Defendant Gessner, is a citizen of the United States and works in Baltimore County, Maryland. At all times relevant herein, Defendant Gessner was an employee of NCIA.

6.   Defendant Rodney Norris, hereinafter Defendant Norris, is a citizen of the United States and works in Baltimore County, Maryland. At all times relevant herein, Defendant Norris was an employee of NCIA.

7.   Defendant Herbert J. Hoelter, hereinafter Defendant Hoelter, is a citizen of the United States and works in Baltimore County, Maryland. At all times relevant herein, Defendant Hoelter was an employer.

8.   Defendant Larry Norris, hereinafter Defendant Larry Norris, is a citizen of the United States and works in Baltimore County, Maryland. At all times relevant herein, Defendant Larry Norris was an employee of NCIA.

**Jurisdiction and Venue**

9.   This action arises under a Federal statute, 42 U.S.C. 2000e-2. Sexual harassment is a form of sex discrimination that violates Title VII of the Civil Rights Act of 1964. Title VII is a federal law that prohibits discrimination in employment on the basis of sex, race, color, national origin, and religion, and it applies to employers with 15 or more employees, including federal, state, and local governments. Retaliation against someone who complains of sexual harassment or participates in an investigation involving sexual harassment is also illegal under Title VII of the Civil Rights Act.

10.   A substantial part of the events giving rise to the claims herein occurred in Baltimore County, Maryland and is covered by Maryland State Law.  The Federal Court has jurisdiction of those claims as they arose out of the same incident as the Federal claims.

3

## Factual Allegations

11. On May 4, 2005, Plaintiff began working for Defendant NCIA as a Job Coach.

12. Defendant Hack worked previously for Defendant NCIA, and was rehired by Defendant NCIA in the summer of 2006 as a Job Coach.

13. While Defendant Hack was working as a Job Coach in the summer 2006, Defendant Hack wore a home monitoring anklet.

14. During the summer of 2006 when Defendant Hack began working again at NCIA, Defendant Billips was the Immediate Supervisor to the Plaintiff as the Operations Supervisor for the Day Program.

15. Defendant Norris was the Operational Manager.

16. In the Fall of 2007, Defendant Hack's monitoring anklet was removed; Defendant Hack was then promoted to Operations Supervisor for the Day Program.

17. Defendant Billips was concurrently promoted to Operational Manager, and Defendant Norris was promoted to Executive Director.

18. When Defendant Hack was promoted in 2007 he became Plaintiff's Immediate Supervisor.

19. Prior to Defendant Hack becoming Plaintiff's supervisor referred to Plaintiff as "Ms. Cook."

20. However in Fall 2007 when Defendant Hack was promoted to supervisor, he stopped calling Plaintiff "Ms. Cook," and began referring to Plaintiff as "Baby," which was offensive to the Plaintiff and unwelcomed.

4

21.    Plaintiff was very uncomfortable with Defendant Hack calling her "Baby," and Plaintiff informed Defendant Hack that she was not comfortable with him calling her "Baby," and asked Defendant Hack to call and refer to her as "Ms. Cook."

22.    Defendant Hack, however, ignored the Plaintiff's request and continued to call and refer to Plaintiff as "Baby," which elevated to Defendant Hack making inappropriate and lewd comments to and about the Plaintiff, sometimes in the presence of others. The Plaintiff was offended and embarrassed.

23.    When Defendant Hack began making sexually suggestive comments to the Plaintiff, the Plaintiff verbally complained to Defendant Billips, the Operational Manager, however, no disciplinary or preventative measures were implemented to stop the repeated unwelcomed sexual comments of Defendant Hack.

24.    In the Spring of 2007, Plaintiff began working as part of the cleaning crew for the night shift.

25.    Plaintiff was the only female on the shift, and around the time Plaintiff began to work the night shift, Defendant Hack came up to the Plaintiff and said to her "baby you need to work mornings, I miss seeing your body." Defendant Hack's comment was unwelcomed, offensive and the Plaintiff felt violated and uncomfortable.

26.    Plaintiff responded to Defendant Hack a demanded that he don't talk to her like that and told him she was offended by his statement. Shortly thereafter Defendant Hack removed Plaintiff from working the night shift, and assigned her to work the day shift.

27.    In November 2007, Defendant Hack went to the Plaintiff while she was sitting with clients and asked Plaintiff if she heard a rumor that Defendant Hack "slept" with her.

Plaintiff said to Defendant Hack "No!" and asked him why he was spreading rumors. The Plaintiff was highly offended and embarrassed.

28. Plaintiff began to feel paranoid and distressed causing her to struggle with her job duties. Feeling overwhelmed by Defendant's Hack's outrageous comment, Plaintiff then asked a couple staff members if they heard a rumor that she and Defendant Hack had slept with each other, and the entire staff members who were asked said "NO!" She realized that Defendant Hack was intentionally distressing the Plaintiff. Plaintiff to feel intimidated by Defendant's Hack.

29. In December 2007, Defendant Hack approached Plaintiff and said to her that he had a dream about himself having sexual intercourse with the Plaintiff.

30. Defendant Hack then stated to that he woke up from that dream, and his under pants were wet. Defendant Hack then said to Plaintiff that the sex was good, and he couldn't stop thinking about it.

31. The Plaintiff was extremely offended with Defendant Hacks comments and was in shock that her supervisor would make such vulgar statements to her. The sexual explicit comments were unwelcomed and unexpected. The Plaintiff felt paranoid and intimidated. The Plaintiff's work day was disrupted because of it. She struggled to be productive and made every effort to avoid Defendant Hack and to not make eye contact with him due to trying to avoid any further conversation concerning the lewd comments he made.

32. In June of 2008, Plaintiff was assigned to client John Raymond Williams.

33. Plaintiff's duties where to pick Client Williams up from his home and take him to find potential jobs. Then Plaintiff was to drop Client Williams off at home at the end of the day.

6

34. Due to this assignment, Plaintiff barely worked within the NCIA building, and rarely had encounters with Defendant Hack.

35. In December 2008, Plaintiff learned that she was pregnant by another man who was the Plaintiff's boyfriend at the time.

36. In May 2009, while Plaintiff was pregnant and an incident occurred where Client Williams pushed the Plaintiff.

37. Due to this incident, Plaintiff was reassigned and came back to work inside of the NCIA building in May 2009.

38. In May 2009, Plaintiff was reassigned to the Day Program, which was relocated to a warehouse.

39. There were about two hundred clients and staff in the warehouse each day, and only one restroom located within the warehouse for everyone to use.

40. There were hard metal chairs within the warehouse that was used for staff members to sit. However, there was one black cushion chair within the warehouse.

41. Plaintiff was 7 months pregnant at this time, and was suffering from fibroids. The Plaintiff desired to use the black cushion chair to ease the pain. The Plaintiff was 7 months pregnant and suffering from fibroids, she experienced great pain.

42. Sitting on the hard metal chairs hurt the Plaintiff and intensified the pain and physical discomfort she experienced from having fibroids and being 7 months pregnant.

43. In May 2009, Plaintiff asked Defendant Hack if she could use of the said chair. Defendant Hack told the Plaintiff that she could not use the black cushion chair because only Ms. Delores could use that chair. Ms. Delores was an older female staff member who was not pregnant and was not suffering from a painful condition.

7

44. The Plaintiff explained to Defendant Hack that she needed to use the chair due to her pregnancy and fibroids as the hard metal chairs caused her great pain. Defendant Hack still declined.

45. Defendant Hack also had a cushion chair in his office, however, Defendant Hack refused to allow Plaintiff to sit in the chair with a cushion, and instead Plaintiff was forced to sit on a hard metal chair even though she was 7 months pregnant with fibroids which caused her discomfort and pain. Plaintiff struggled to complete her duties due to the pain.

46. On another occasion in May 2009, Plaintiff asked Defendant Hack if she could use the Taco Bell restroom that was located near the warehouse.

47. There was only one restroom located in the warehouse, and one of the clients with behavioral issues, defecated and smeared feces over the entire restroom.

48. Plaintiff was pregnant with fibroids, and because of her condition, Plaintiff frequently needed to use the restroom.  Due to her condition she needed to sit down on the toilet.

49. When Plaintiff entered the restroom in the warehouse in an attempt to use it, she almost vomited because of its condition. Plaintiff explained this to Mr. Hack and he was un-phased.

50. Plaintiff asked Defendant Hack if she could use the restroom located in the nearby fast food restaurant.

51. Defendant Hack told Plaintiff that she could not use the Taco Bell restroom, and told her that she had to use the warehouse restroom along with over two hundred other people that consisted of clients and staff.

52.    Other supervisors working at NCIA did not have an issue with Plaintiff sitting in the more comfortable chairs or using the restroom at the nearby fast food restaurant, and allowed her to do so.

53.    Defendant Hack was the only supervisor who refused to accommodate Plaintiff's condition of being pregnant and having fibroid issues by not allowing Plaintiff to use the nearby restroom and sit in a more comfortable chair.

54.    Defendant Hack's refusal to allow the Plaintiff a cushioned chair and to use the Taco Bell restroom disrupted the Plaintiff's work flow and caused her to struggle with her work assignments.

55.    In October 2009, Defendant Hack suspended Plaintiff and Ms. Shelley Mulazim for failing to report that a client had accused a staff member of sexual misconduct.

56.    The accused staff member did not work for NCIA and had no affiliations with NCIA.

57.    The Team leader, Dale, a male, also heard the accusations of the client and instructed both Plaintiff and Ms. Mulazim not to pay any attention to what the client had stated, and they complied.

58.    Despite the fact that Dale, Mulazim and the Plaintiff were involved in the same conversation concerning the accusations, Defendant Hack, however, did not suspend Dale.

59.    Plaintiff was upset and felt targeted especially since no disciplinary actions were taken against Dale who instructed her not to pay attention to the comments made by the client.

60.    Plaintiff talked to Defendant Billips about the suspension and the incident, and Defendant Billips instructed Defendant Hack to tear up the write-up against the Plaintiff and not to suspend her.

9

61.     On June 30, 2009, Plaintiff went on maternity leave.

62.     In July 31 2009, Plaintiff gave birth to her child.

63.     On October 1, 2009, Plaintiff returned to work at NCIA.

64.     When Plaintiff returned, the NCIA had relocated back to the original building it was in prior to the warehouse.

65.     On February 6, 2010, Plaintiff was promoted to the position of Art Instructor.

66.     In February 2010, Defendant Hack waived his hand and signaled Plaintiff to come into the art room. Plaintiff went into the art room where Defendant Hack was assuming he called her for work related reasons; but, instead, he said to Plaintiff "Baby Ooo, you have everything set for your class?" The Plaintiff felt very humiliated, angry and uncomfortable and told Defendant Hack again to stop calling her "Baby" and that "Baby" is not her name. On this date, the Plaintiff was intimidated by Defendant Hack's actions and she made every effort to avoid Defendant Hack, which caused a disruption in performing her duties.

67.     On a different day in that same month of February 2010, Defendant Hack told Ms. Mulazim about his sexual dreams and sexual fantasies he had of the Plaintiff. This conversation occurred in the presence of Plaintiff.

68.     Plaintiff felt embarrassed and offended by Defendant Hack's comments and told Defendant Hack to stop telling people about his dreams.

69.     Defendant Hack responded to Plaintiff by stating "It's just a dream." Both women were offended by Defendant Hack's comment. The Plaintiff felt intimidated and paranoid that he would continue to repeat his dreams to other employees.

70.     In the same conversation, Defendant Hack then stated to Ms. Mulazim that he would like to have a threesome with Plaintiff and Ms. Mulazim.  He stated that he turned his ex-

10

wife and current wife out into liking women and asked Plaintiff and Ms. Mulazim if they were down with that. They were offended and declined. Again this left the Plaintiff feeling very distressed. Again, the Plaintiff struggled with of her duties due to the perverted comments of Defendant Hack.

71. On a another occasion in the same month of February 2010, Defendant Hack's harassment continued and his actions intensified as Defendant Hack called Plaintiff "a piece of shit" in front of clients and staff. Plaintiff was humiliated and intimidated by his comment.

72. In February 2010, Defendant Hack pulled Plaintiff's hair while she was walking.

73. In February 2010, on another occasion, Defendant Hack again pulled the Plaintiff's hair while she was in the art room without the permission of the plaintiff.

74. Plaintiff felt humiliated when Defendant Hack called her "a piece of shit," and Plaintiff was in shock and very upset when Defendant Hack unexpectedly touched her by pulling her hair. She was afraid of what he might do next. This action disrupted her day and caused her to be ineffective at work due to the extreme action by Defendant Hack.

75. In March of 2010, the Plaintiff reached a breaking point and felt depressed and anxious about being in the presence of Defendant Hack. However she was unable to resign from her job due to financial reasons.

76. Plaintiff went to Defendant Billips and reported Defendant Hack's inappropriate actions in March 2010. Plaintiff demanded that Defendant Billips, Defendant Hack, and Plaintiff have a meeting immediately, which was her attempt to force a resolution.

77. In March 2010, Defendant Billips set up a meeting, in which Plaintiff reported to Defendant Billips that Defendant Hack has pulled her hair, made references to sexual dreams he had of him and the Plaintiff, called Plaintiff "Baby," and called Plaintiff "a piece of shit" when

11

Defendant Hack was upset with her. She explained that he conducts himself in this manner in the presence of Staff. She also explained that she was afraid of Mr. Hack because she did not know how far he would go and that she was humiliated in front of the staff members.

78.    In the meeting, Plaintiff explained to Defendant Billips that Defendant Hack's actions left her feeling very intimidated and humiliated, as well as in shock that her supervisor would put his hands on her and grab her hair. During the entire meeting, Defendant Hack was smiling as if to be enjoying the frustration of the Plaintiff and boldly admitted to the allegations stated by the Plaintiff.  He also said with a smile on his face that he always called Plaintiff "a piece of shit." Defendant Billips stated to Defendant Hack that he shouldn't call Plaintiff "a piece of shit."

79.    Plaintiff then told Defendant Billips that Ms. Mulazim witnessed these events and that Defendant Billips could question Ms. Mulazim as she knew Plaintiff was to have this meeting.

80.    Defendant Billips never contacted Ms. Mulazim for her witness statements and never took any actions to discipline Defendant Hack and or take any reasonable steps to prevent further sexual harassment of the Plaintiff by Defendant Hack.

81.    In March 2010 after the meeting with Defendant Billips, Defendant Hack continued to pull Plaintiff's hair and state to her "baby why you wearing this in your hair." Despite Plaintiff's efforts to stop the harassment, the harassment continued.

82.    In March 2010, a staff member spoke to Defendant Hack and inquired about the whereabouts of the Plaintiff. Defendant Hack then referred to Plaintiff as "a piece of shit" when talking to the staff member. The Staff member relayed his comments to the Plaintiff. Again this

left the Plaintiff feeling humiliated and upset. This disrupted the Plaintiff's work day in that she struggled to be productive on that day.

83.    On March 29, 2010, Plaintiff arrived at work and was left in the Art room with four male clients, John Raymond Williams, Arthur Ransom, Brian Palmer and William Dredden. All of the male clients required a one to one with one staff member for each client.

84.    Plaintiff's client was Mr. Dredden, however no other staff members where present for the remaining three male clients.

85.    Plaintiff walked the three clients to Defendant Hack's Office to inquire about the whereabouts of the staff members for the three clients.

86.    Defendant Hack was responsible for assigning staff members to clients; however, Defendant Hack did not assign any staff members, leaving the Plaintiff by herself with three male clients for the entire workday.  This was a breach of the safety policy concerning clients.

87.    Being that the Plaintiff was a female left alone with three male clients, and the fact that one of the clients had physically assaulted her on a prior occasion, the Plaintiff felt afraid and threaten to be left alone with three male client for the entire workday.  She was unable to perform her duties effectively due to Mr. Hack intentionally scheduling three difficult male clients with her without assistance.

88.    On March 30, 2010, Defendant Hack came into the Art room and saw John Raymond Williams sitting in Plaintiff's class without a staff member. Defendant Hack left out and did not take the client with him, which again left Plaintiff with two one to one male clients to watch that day.

89.    Plaintiff again felt afraid when she was left alone with client Dredden and client Williams especially since client Williams had pushed her while she was pregnant in the May 2009.

90.    On March 31, 2010, at 1:50pm, Ms. Mulazim called Defendant Hack into the Art room to tell him that Plaintiff and Ms. Mulazim where scheduled for class and the class never showed up. While Defendant Hack and Ms. Mulazim where talking, Plaintiff was at the sink drinking water because her blood pressure was very high. The Plaintiff was in hearing distance from Defendant Hack and Ms. Mulazim.

91.    When Defendant Hack into the doorway of the room, Defendant Hack asked Ms. Mulazim what Plaintiff was doing?

92.    Defendant Hack stated "I know she ain't on the phone." Ms. Mulazim replied that Plaintiff was drinking water. Defendant Hack then called Plaintiff's name.

93.    As Defendant Hack and Ms. Mulazim were talking about what Plaintiff was doing, Plaintiff was drinking water from her right hand.

94.    When Defendant Hack called Plaintiff, Plaintiff turned around.

95.    Defendant Hack then said "She Stupid!" Plaintiff was offended.

96.    This comment disrupted her day as she became more frustrated as the day went on with the words continually playing over in her mind.

97.    Later that day around 2:25 p.m., Plaintiff went to Defendant Billups's Office to inform him of what had transpired and how it made her feel. Plaintiff also stated to Defendant Billips that she needed another meeting with Mr. Hack and Mr. Billups to try to stop his relentless harassment.

98.     Defendant Billips asked Plaintiff if she said anything back to Defendant Hack, and Plaintiff replied no. Defendant Billips then told Plaintiff to write everything down with the date and time, and take it to Defendant Jane Gesner, Director of HR.

99.     After speaking to Defendant Billips, Plaintiff went to speak with Defendant Jane Gessner, Director of HR (meaning, Human Resources Department). The Plaintiff complied. Defendant Gessner accepted the complaint. However, nothing transpired to investigate, prevent and/or discipline Defendant Hack for his harassment of the Plaintiff.

100.    Defendant Billips did not set up another meeting as Plaintiff requested and Defendant Gessner did not attempt to investigate the Plaintiff's claim and Defendant Hack continued to frequently make inappropriate comments to the Plaintiff.

101.    On one such occasion in March 2010, Plaintiff witnessed Defendant Hack smack Ms. Mulazim on her butt with a ruler and said to Ms. Mulazim "Baby that ass fat; you should let me take you out."

102.    Plaintiff was shocked that Defendant Hack would touch a staff member in such an inappropriate and sexual way. After witnessing what Defendant Hack had done to Ms. Mulazim, Plaintiff was afraid that Defendant Hack might try to smack Plaintiff on her butt next with the ruler.

103.    Plaintiff was very intimidated with what she witnessed, and did not want Defendant Hack to touch her at all. Defendant Hack's actions caused the Plaintiff to struggle with her duties throughout the day.

104.    On another occasion in March 2010, Defendant Hack asked Plaintiff "Baby where's your client?"

105.     Plaintiff, frustrated and offended with Defendant constantly calling her baby, Plaintiff responded to Defendant, "My name is Shalelah, not Baby."

106.     On April 1, 2010, Defendant Hack assigned the Plaintiff to client John Raymond Williams. Client Williams should not have been assigned to the Plaintiff due to the fact that Client Williams had assaulted the Plaintiff in the past when she was pregnant. In May 2009, The Plaintiff was reassigned due to that incident, and the Plaintiff was upset that she would be assigned to client Williams when that client had physically assaulted her. Plaintiff believed that Mr. Hack was again harassing her and was intentionally distressing her.

107.     Defendant NCIA has a policy against staff member being assigned to clients where a physical altercation has occurred. Due to this policy the Plaintiff was upset that she would be assigned to client Williams.

108.     The Plaintiff had spoken with Mr. Smith about this assignment and stated to him "remember he pushed me when I was pregnant, and I wrote it up."

109.     Mr. Smith replied "you aint in no predicament to say that, you already in hot water." Plaintiff replied "by who?" Mr. Smith then answered, "Hack."

110.     Plaintiff was upset by Mr. Smith's statement, and she felt worried about Defendant Hack's possible future actions.  She felt that NCIA was not going to give her any protection against Mr. Hack.

111.     Plaintiff went to talk to Defendant Billips in reference to the conversation she had recently had with Mr. Smith.

112.     After speaking with Defendant Billips, Plaintiff went to see Nurse Lydia, who worked as Nurse for Defendant NCIA because Plaintiff was not feeling well.

113.     Plaintiff was experiencing headaches, pain and nauseous.

16

114.    Nurse Lydia took the Plaintiff blood pressure and Plaintiff's blood pressure was 190/119 and her pulse was 105 which were due to Defendant Hack's harassment and NCIA's allowing his behavior towards her.

115.    Plaintiff was frightened by her blood pressure results. Plaintiff believed that her blood pressure was high because of the stress from Defendant Hacks treatment of her.

116.    Nurse Lydia told Plaintiff to show her results to Defendant Billips and tell Defendant Billips that Plaintiff needed to leave. Plaintiff went to Defendant Billips and asked if she could go home.

117.    After Plaintiff left, she went to Defendant Norris and explained to him what had transpired.

118.    On April 2, 2010, Plaintiff came to work and was told by Staff Member Mr. Dennis that he was assigned William Dredden. Plaintiff replied "No, because you haven't been in service on him and William Dredden was my client."

119.    Twenty minutes later, Defendant Hack came into the art room and told William Dredden to leave and go to the pet cemetery with Mr. Dennis.

120.    Defendant Hack then told Mr. Williams to sit in the room with Plaintiff and keep his mouth shut, and that he'll be back. Defendant Hack never came back and left Plaintiff with Mr. Williams for the rest of the workday. Plaintiff believed that Defendant was intentionally distressing her.

121.    Plaintiff was upset that Defendant Hack would leave Client Williams with her and tell her client Mr. Dredden to leave. Plaintiff felt intimidated and worried to be left alone with client Williams. The Plaintiff struggled through her workday due to Defendant Hack's actions.

17

122.    At 9:45 a.m. on April 2, 2010, Plaintiff went to the office of Defendant Gesner and explained what happened with Defendant Hack. Plaintiff returned to work at 10:25am. Defendant Gesner took no action as to Plaintiff's complaint.

123.    In April 2010, Plaintiff, still suffering from fibroids, was again denied access to the Taco Bell restroom when she asked Defendant Hack if she could use it.

124.    Defendant Hack refused and stated to the Plaintiff that there was no coverage even though Defendant Hack was available to watch the Plaintiff's clients while she used the restroom.

125.    When Defendant Hack refused to allow the Plaintiff to use the bathroom, the Plaintiff felt humiliated, uncomfortable and in pain.

126.    In April 2010, Plaintiff, her client and other staff member were in a company van to look for jobs, when a call came through from Defendant Hack stating that the Plaintiff needed to come back to the building. This call upset the Plaintiff's client who was told by Mr. Richard Smith, who was a Team Leader and Supervisor that the client and the Plaintiff could leave the building.

127.    Plaintiff again felt humiliated and upset that her client was very disappointed that he could not seek employment after her client was told that he could. This frustrated the client and caused the Plaintiff to have to work with the client to change his state of mind in order to have a productive day.

128.    On another occasion in April 2010, Plaintiff was wearing eye shadow and Defendant Hack came into the Art room and said to the Plaintiff "Baby it's something about your eyes that got me looking."

18

129.    Plaintiff felt very offended by Defendant Hack's unwelcomed comment. The Plaintiff remained silent, tried to pretend he did not exist and attempted to go on with her assigned duties.

130.    On another occasion in April 2010 around 3:10 p.m., Plaintiff was sitting in the cafeteria with staff members Diane and Shelley Mulazim when the team leader Dale made an announcement.

131.    Team leader Dale announced, "If all clients are gone, y'all can leave." In response to that announcement, Ms. Mulazim, Ms. Diane, and the Plaintiff began to leave.

132.    As Ms. Mulazim, Ms. Diane and Plaintiff were leaving, Defendant Hack shouted out "Hey Shalelah! Where you think you going, it's not 3:30 (meaning 3:30 p.m.)." Defendant Hack allowed all the staff members who heard the announcement and worked the same schedule as the Plaintiff to leave. The Plaintiff on the other hand, was not allowed to leave until 3:30pm.

133.    The Plaintiff felt humiliated when Defendant Hack shouted her name out in a loud and disrespectful manner and told her she could not leave. Everyone else left and the Plaintiff had to wait. Plaintiff was intimidated being the only employee left behind with Defendant Hack.

134.    After leaving work, Plaintiff went to her Kaiser Doctor's appointment. At the Doctor's appointment, Plaintiff was informed that her blood pressure was extremely high, which was an unusual reading for her.

135.    Plaintiff contacted Defendant Billips and informed him of the incident. The Plaintiff again pleaded to Defendant Mr. Billips to talk to Defendant Hack and order him to stop harassing her.

136.    Plaintiff began to feel hopeless because of the constant harassment perpetuated by Defendant Hack's and accepted by the managers, which was affecting the Plaintiff emotionally

19

and physically. Plaintiff explained this to Defendant Billips and asked Defendant Billips to ask Defendant Mr. Hack why he was so infatuated with the Plaintiff.

137.    On April 8, 2010 at 2:55 p.m., Team leader Dale asked if Plaintiff could watch client Angie Selleman because she refused to ride in the van. Plaintiff complied.

138.    Before Plaintiff began to watch Client Angie, Plaintiff needed to use the restroom.

139.    Plaintiff was still suffering from fibroids and which caused her to use the restroom frequently.

140.    As Plaintiff was about to enter the restroom, Defendant Hack saw Selleman, Dale and the Plaintiff and stated to give Selleman to the Plaintiff.

141.    Plaintiff again felt humiliated with Defendant Hack's attempt to prevent the Plaintiff from using the restroom; however, with persistence from the Plaintiff she was allowed to use the restroom before overseeing Client Selleman.

142.    Nearing to the time Plaintiff was due to get off work; Plaintiff asked Mr. Smith if she could leave. Mr. Smith said yes, if Plaintiff found someone to watch Client Selleman.

143.    On April 8, 2010, at 3:35 p.m., five minutes after Plaintiff was scheduled to get off of work and five minutes after Plaintiff was scheduled for a Doctor's appointment, Plaintiff asked David Duboise, caseworker for Defendant NCIA, if he could watch Client Selleman. Mr. Duboise agreed.

144.    Before Plaintiff could leave, Mr. Smith came back into Mr. Duboise office, and told Plaintiff that she would start working the next day at 7:00 a.m. to 3:00 p.m..

145.    On April 9, 2010 Mr. Hack changed Ms. Cook's schedule from working 7:30 a.m. -3:30 p.m. to working 7:00 a.m. to 3:00 a.m..

20

146. Plaintiff was upset, depressed and humiliated with this sudden and unwarranted schedule change because it would interfere with her daughter's day care schedule and unnecessarily disturb Plaintiff's daily routine.

147. Defendant Hack knew that Plaintiff took her daughter to day care, and the change in her schedule would be in conflict with the Plaintiff's daughter's day care schedule

148. After Plaintiff discovered that her schedule was changed; she went to Human Resources to speak with Defendant Norris.

149. The Plaintiff explained to Defendant Norris how Defendant Hack continued to harass her and that she wanted it to stop; and, she asked Defendant Norris to resolve the issue concerning her abrupt schedule change and instruct Defendant Hack to stop harassing her.

150. Plaintiff explained to Defendant Norris that she continues to have high blood pressure because of the stress that she has acquired due to Defendant Hack's harassment.

151. Defendant Norris dismissed the Plaintiff's complaints about Defendant Hack harassing her and told the Plaintiff to not let Defendant Hack get to her. Defendant Norris only spoke to Defendant Hack concerning the scheduling issue.

152. On April 11, 2010, after suffering with years of harassment by Defendant Hack and reporting his harassment with no resolution by Defendant NCIA, Plaintiff was forced to resign her position as Art Teacher and voluntarily demoted herself to Job Coach in an effort to get away from the harasser Defendant Hack.

153. Before resigning, Plaintiff was a full time Art Teacher and a part time Job Coach.

154. After resigning she became a full time Job Coach.

155. The position of Job Coach was less money and seniority but allowed Plaintiff to spend a greater amount of time out of the building as she would be allowed to take client out on

21

the van with other staff members to find employment. This position would allow the Plaintiff to distance herself from Defendant Hack for majority of her days at work.

156.   On April 13, 2010 at 7:45a.m., Plaintiff was in the copy room when Mr. Hack unexpectedly entered with another team leader and stated to Ms. Cook "oh yeah, you know your 8am to 4pm now."

157.   Plaintiff then called Defendant Billips to complain about Defendant Hack constantly and unnecessarily changing her schedule. She also advised Billips that she believed that Defendant Hack was trying to intentionally cause her problems.

158.   In April 2010, Defendant Hack continued to come into the Art room and pull Plaintiff's hair and said to her "why you keep wearing all that baby in your hair." This offensive behavior and comments were unwelcomed and distressed the Plaintiff.

159.   In July 2010, Plaintiff went on leave for fibroid surgery. On October 12, 2010 Plaintiff returned to work.

160.   Upon the Plaintiff's return, the harassment continued with Defendant Hack acting belligerently toward the Plaintiff and intentionally trying to sabotage the Plaintiff's performance with her clients.

161.   On October 14, 2010 at 10:00 a.m., Defendant Hack yelled and utterly disrespected the Plaintiff's client and yelled in the client's face in a very loud voice yelling to the client that he would not pay him. This outrageous behavior upset the client tremendously, who has psychological limitations to deal with such behavior. The Plaintiff tried to get the client back on track to no avail.

162.   Defendant Hack became upset with the Plaintiff's client because the client did not want to ride in the van this day to look for a job. Defendant Hack did this knowing that the

Plaintiff would have to deal with the client's behavior throughout the day and this would make the Plaintiff's day difficult.

163.     On October 15, 2010 at 9:40 a.m., Defendant Hack asked Plaintiff why her client wasn't working. Plaintiff replied that her client refused to work. Defendant Hack then told the Plaintiff "you couldn't make him." Seven minutes later the Plaintiff was told to assist a new client.

164.     The new client that Plaintiff was assigned to was client Billy Valentin, who is hyperactive and constantly jumped in the air and ran very fast around the room. The client also kicked people and grabbed people very aggressively. Defendant was still recovering from her fibroid surgery and assisting this client would be dangerous and adverse to the Plaintiff's recovery. Defendant Hack was aware of this client's behavior and acted intentionally when he assigned the client to the Plaintiff who he knew was recovering from her resent surgery.

165.     On October 16, 2010, Plaintiff went to speak with Defendant Gassner about Defendant Hack's behavior towards her.

166.     On October 18, 2010 at 10:20 a.m., Plaintiff talked to Defendant Hoelter, the CEO of Defendant NCIA and explained to him that Defendant Hack had been harassing her.

167.     Plaintiff asked Defendant Hoelter if he received her grievance letters. Mr. Hoelter replied "No", he didn't think so, and then told the Plaintiff to talk to Defendant Norris

168.     On October 20, 2010 at 3:10 p.m., Plaintiff briefly spoke with Defendant Norris regarding Defendant Hack's behavior towards her.

169.     On October 21, 2010 at 9:10 a.m., Defendant Hack sat in the Art room at a table across from the Plaintiff, and occasionally watched Plaintiff with a piercing stare directed at the

23

Plaintiff coupled with an intimidating and angry expression. Defendant Hack's stares made the Plaintiff feel very uncomfortable and afraid for her safety.

170.    In an effort to deal with Defendant Hack's careless assignments on October 25, 2010, Plaintiff brought a Doctor's note to Defendant Billips stating that she could not run or restrain clients. Instead of assigning the Plaintiff to less active clients, Defendant Billips responded to the Doctor's note stating that he could accommodate the Plaintiff only with a clerical position that would pay less and have fewer hours than the Plaintiff's current position. The Plaintiff did not want to be demoted.

171.    The Plaintiff could not afford to receive less pay especially after being demoted as stated previously, so the Plaintiff endured in an effort to maintain her employment.

172.    After being threatened with a demotion, on October 28, 2010, Plaintiff wrote another grievance letter about being harassed by Defendant Hack.

173.    In addition, on October 28, 2010, Plaintiff formally filed a complaint with the Equal Employment Opportunities Commission, hereinafter EEOC, for sexual harassment and retaliation.

174.    Even after the Complaint was filed with EEOC, Defendant Hack persisted in harassing the Plaintiff and began retaliating against her.

175.    In August 2011, Plaintiff was walking to the restroom and Defendant Hack was sitting in the hallway. When Plaintiff passed Defendant Hack on her way to the restroom, Defendant Hack said to her "where you going?" Plaintiff replied "to the restroom." Defendant Hack then stated, "What you on your period? You done went like three times."

176. On September 26, 2011, Plaintiff transferred out of the Day Program at NCIA and went to work as an IEP and a Van Aid at the YIT School, which was within the scope of duties of Defendant NCIA.

177. After Plaintiff transferred out of the Day Program at NCIA the Plaintiff believed that she no longer encounter Defendant Hack.

178. On October 12 2012, while Plaintiff was working as an IEP Aid at the YIT School, Plaintiff overheard a student threaten to shoot staff member Roy White, who was a Behavior Specialist. The Student accused Mr. White of hitting the student. Plaintiff saw the student with a busted lip, and immediately reported the statement to the Principal.

179. An investigation took place about the accusation; however, Plaintiff was never questioned by the outside investigators about the incident.

180. On December 20, 2012, Plaintiff overheard Mr. White make inappropriate comments about a challenged student.

181. Plaintiff informed Principle Kenny about the comments and stated that the Teacher's Aid, Ashley Fuller had also witnessed Mr. White make those comments.

182. Mr. White was offended by the Plaintiff revealing his bad behavior against the student. He along with another employee Mureen Louisea began to bully the Plaintiff and tried to create reasons to write the Plaintiff up for discipline.

183. On January 2, 2013 The Plaintiff had a meeting with the Principal Kenny and the Executive Director Defendant Larry Norris concerning Mr. White and Ms. Maureen's actions towards the Plaintiff.

184. Plaintiff also wrote a grievance letter about the staff members' actions toward her as well.

25

185.     The Plaintiff informed her supervisors of the incidents concerning the victimized student. The Plaintiff believed that the adverse action was in retaliation for her having filed the EEOC complaint. The Plaintiff received no assistance or support, which Plaintiff was in retaliation for her having filed the EEOC Complaint.

186.     In December 2012, Plaintiff was sent to work in the paint house while the investigation about Mr. White's actions was taking place; Mr. White was never removed from the building or punished for his actions.

187.     In January 2013, after the investigation had concluded the Plaintiff was sent to work in another building.

188.     On January 11, 2013, Defendant NCIA responded for the first time to the Plaintiff's EEOC claim for sexual harassment and retaliation.

189.     On March 13, 2013, Plaintiff submitted a rebuttal to Defendant NCIA's response.

190.     On April 16, 2013, Defendant NCIA wrote a letter to the Plaintiff terminating her employment at the YIT School and NCIA.

191.     Plaintiff did not receive this letter until April 17, 2013. Mr. Charles Holloway, Assistant Director of Education handed the Plaintiff the letter, and stated to the Plaintiff that he was handing this letter to her a day late because he was attempting to fight for the Plaintiff to keep her job.

192.     The letter stated that the Plaintiff's employment was ending because her assigned student had been removed from the program and Defendant NCIA had no other options to either retain the Plaintiff or assign a new student because there were no current openings.

193.    While Plaintiff is student had been removed from the program, Plaintiff still was working as a Van Aid which did not require the assignment of a student. Plaintiff was doing her duties as a Van Aid during the days that her student was absent from the school.

194.    Plaintiff did other work around the school besides her current position that did not require the assignment of a student.

195.    In June 2013, multiple employees were laid off from NCIA from their employment from the YIT School because the senior class had graduated. However, it is YIT School and Defendant NCIA's policy to rehire employees that were laid off when positions become available. It is also the policy of the YIT School and Defendant NCIA to give priority to workers with seniority that were laid off.

196.    The Plaintiff had seniority and was never called back when positions became available. Also, other employees that were laid off who did not have seniority were called back to open positions.

197.    In December 2013, the YIT School hosted an open house at the school for open positions.

198.    The Plaintiff did not receive a call or a letter to attend the open house.

199.    Plaintiff was upset and disappointed that Defendant NCIA would not offer her an open position especially since, she was laid off due to the fact that Defendant NCIA stated that there were no open positions available.

200.    Plaintiff believes that she was laid off and not offered a job when positions became available due to the claim the Plaintiff filed with the EEOC.

**Exhaustion of Administrative Remedies**

201.    The Plaintiff has exhausted her administrative remedies. On or about October 28, 2010, she filed with the U.S. Equal Employment Opportunity Commission ("EEOC") a timely administrative charge of sexual harassment and retaliation, against Defendants NCIA, James Hack, Walter Billips, Jayne Gessner and Rodney Norris.

202.    The EEOC has made a determination in the Plaintiff favor for the charge of sex discrimination and retaliation. See Exhibit 1.

203.    Conciliation was conducted; however, the parties did not come to an agreement.

204.    Plaintiff has received a Notice of Right to Sue from the EEOC. See Exhibit 2.

## Count I
### Sexual Harassment
### (Defendant National Center Institution Alternatives)

205.    Plaintiff reiterates, re-alleges, and incorporates herein by reference each and every allegation contained in paragraphs 1-204 inclusive.

206.    The actions of Defendant NCIA constitute sex discrimination against the Plaintiff, in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-2 (a) (1), which makes unlawful discrimination against employees on the basis of sex.

207.    Sex discrimination includes sexual harassment. The actions of Defendant NCIA constitutes one type of sexual harassment, which holds employers vicariously liabile for the acts of sexual harassment in the workplace by an employee.

208.    Defendant NCIA is an employer within the meaning of Title VII, 42 U.S.C. § 2000-e (b).

209.    The Plaintiff and Defendants Hack are employees within the meaning of Title VII, 42 U.S.C. § 2000-e (f).

210. The Plaintiff and Defendant Hack where employees of Defendant NCIA during the time of the alleged sexual harrasment.

211. Defendant Hack was the Operational Supervisor for the Day Program and the Immediate Supervisor to the Plaintiff and possessed the authority to manage, assign work, discipline and terminate the Plaintiff.

212. Defendant Hack's conduct towards Plaintiff constituted sexual harassment that Defendant NCIA knew or should have known of.

213. Each and every act of harassment by Defendant Hack was unwelcomed conduct and was based on the Plaintiff's sex.

214. Defendant Hack's conduct was severe or pervasive enough that it created a work environment that a reasonable person would consider intimidating, hostive or abusive.

215. The Plaintiff was intimidated and felt that her work environment was hotile and abusive.

216. Defendant NCIA failed to take immediate, appropriate and sufficient action to prevent, and stop the sexual harassment by Defendant Hack towards the Plaintiff.

217. On several ocassions between the years of 2007 and 2011, Plaintiff informed several persons within managerial positions about the sexual harassment of the Plaintiff by Defendant Hack. See Factual Allegations of this Complaint.

218. While some meetings where held, and minor repramands where given, these actions neither prevented nor reasonably address the repeated pervasive sexual harassment of the Plaintiff by Defendant Hack.

219.   Defendant Hack was never seriously dicisplined nor repremanded for his actions by Defendant NCIA and was allowed to manintain a managerial position and to repeatedly harass the Plaintiff before the filing of the EEOC Complaint and after.  See Factual Allegations.

220.   The Defendant NCIA allowed Defendant Hack to create a hostile work environment in which the Plaintiff was subjected to unwelcome verbal and physical sexual behavior, including allowing Defendant Hack to call her "Baby", "a piece of shit", relay sexual dreams and fantasies about her to the Plaintiff and other employees, and other conduct of a sexual nature that was so severe and pervasive that it adversely affected her ability to do her work and even forced her to move to a job making less pay to escape the harassment. See Factual Allegations.

221.   As a direct and proximate result of Defendant NCIA's lack of actions to prevent and/or stop the sexual harassment by Defendant Hack described herein, Plaintiff has suffered from a loss of income and benefits, severe emotional distress, mental anxiety, high blood pressure, nightmares, and fear of being touched sexually by Defendant Hack for all of which she deserves to be compensated.

## Count II
## Sexual Harassment
## (Defendant James Hack)

222.   Plaintiff reiterates, re-alleges, and incorporates herein by reference each and every allegation contained in paragraphs 1-221 inclusive.

223.   The actions of Defendant Hack constitute sex discrimination against Plaintiff, in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-2(a)(1), which makes unlawful discrimination against employees on the basis of sex.

224. Sex discrimination includes sexual harassment. The actions of Defendant Hack constitutes one type of sexual harassment, which creates an offensive and/or hostile work envioronment

225. The Plaintiff and Defendants Hack are employees within the meaning of Title VII, 42 U.S.C. § 2000-e (f).

226. The Plaintiff and Defendant Hack where employees of Defendant NCIA during the time of the alleged sexual harrasment.

227. Defendant Hack was the Operational Supervisor for the Day Program and the Immediate Supervisor to the Plaintiff.

228. On several ocassions between the years of 2007 and 2011, throuhout Plaintiff employment at the NCIA, Plaintiff was subject to sexual harassment by the Plaintiff's Supervisor, Defendant Hack.

229. Defendant Hack made unwelcome sexually suggestive and lewd comments to Plaintiff.

230. Defendant Hack also inappropriately touched Plaintiff without her permission, and continued to do so even though Plaintiff clearly told Defendant Hack to stop.

231. Defendant Hack inappropriately called Plaintiff "Baby," and pulled her hair on several ocassions.

232. Defendant Hack made inappropriately made comments about sexual dreams he had of Plaintiff, as well as calling Plaintiff harse and unwelcomed names such as "piece of shit" and "stupid."

233. Defendant Hack verbally and physically sexually harassed Plaintiff throughout her employment with NCIA.

31

234. Further, Defendnat Hack denied her the opportunity to use the bathroom repeatedly when she was pregnant and at other times.

235. He disrupted her work by creating a hotile work environment in her clients and making it difficult to work with her client.

236. Defendant Hack also changed her work schedule without prior notice as a form of harassment and not out of need for the position she held.

237. Defendant Hack's behavior created a hostile work environment in that the Plaintiff was subjected to unwelcome verbal and physical sexual harassment, including Defendant Hack referring to the Plaintiff as "Baby", "a piece of shit", and described his sexual dreams and sexual fantasies about her to the Plaintiff and other conduct of a sexual nature that was so severe and pervasive that it adversely affected her ability to do her work.

238. Each act of harassment by Defendant Hack was unwelcomed by the Plaintiff.

239. As a direct and proximate result of Defendant Hack's actions described herein, Plaintiff suffered loss of income and benefits, severe emotional distress and mental anxiety, High Blood Pressure, nightmares, and fear of being touched secually by Defendant Hack for all of which she should be compensated.

**Count III**
**Sexual Harassment**
**(Defendant Walter Billips)**

240. Plaintiff reiterates, re-alleges, and incorporates herein by reference each and every allegation contained in paragraphs 1-239 inclusive.

241. The actions of Defendant Billips constitute sex discrimination against the Plaintiff, in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-2 (a) (1), which makes unlawful discrimination against employees on the basis of sex.

242. Sex discrimination includes sexual harassment. The actions of Defendant Billips constitutes one type of sexual harassment, which holds employers vicariously liabile for the acts of sexual harassment in the workplace by an employee.

243. The Plaintiff, Defendant Hack and Defendant Billips are employees within the meaning of Title VII, 42 U.S.C. § 2000-e (f).

244. The Plaintiff, Defendant Hack and Defendant Billips where employees of Defendant NCIA during the time of the alleged sexual harasment.

245. Defendant Hack was the Operational Supervisor for the Day Program and the Immediate Supervisor to the Plaintiff.

246. Defendant Billips was the Operational Manager and the Immediate Manager to Defendant Hack and had the authority to manage, assign work, discipline and terminate the Plaintiff. Defendant Billips also had the authority to manage, assign work, discipline and terminate Defendant Hack and Plaintiff.

247. Defendant Hack's conduct towards Plaintiff constituted sexual harassment that Defendant Billips had been apprised by the Plaintiff on several ocassions (2007 and 2011) and knew or should have known of the harassment the Plaintiff experienced at the hands of Defendant Hack.

248. Each and every act of harassment by Defendant Hack was unwelcomed conduct and was based on the Plaintiff's sex which was known by Defendant Billips..

249. Defendant Hack's conduct was severe or pervasive enough that it created a work environment that a reasonable person would consider intimidating, hostive or abusive.

250. The Plaintiff was intimidated and felt that her work environment was hotile and abusive.

33

251.    Defendant Billips failed to take immediate, reasonable and sufficient action to prevent, and stop the Defendant Hack's sexual harassment of Plaintiff.

252.    Defendant Billips repremanded Defendant Hack for his actions.

253.    As a direct and proximate result of Defendant Billips's lack of actions to prevent and/or stop Defendant Hack's sexual harassment of the Plaintiffy Defendant Hack described herein, , Plaintiff has suffered from a loss of income and benefits, severe emotional distress and mental anxiety, high blood pressure, nightmares, and fear of being touched secually by Defendant Hack for all of which she should be compensated.

### Count IV
### Sexual Harassment
### (Defendant Jayne Gessner)

254.    Plaintiff reiterates, re-alleges, and incorporates herein by reference each and every allegation contained in paragraphs 1-253 inclusive.

255.    The actions of Defendant Gessner constitute sex discrimination against the Plaintiff, in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-2 (a) (1), which makes unlawful discrimination against employees on the basis of sex.

256.    Sex discrimination includes sexual harassment. The actions of Defendant Gessner constitutes one type of sexual harassment, which holds employers vicariously liabile for the acts of sexual harassment in the workplace by an employee.

257.    The Plaintiff, Defendant Hack and Defendant Gessner are employees within the meaning of Title VII, 42 U.S.C. § 2000-e (f).

258.    The Plaintiff, Defendant Hack and Defendant Gessner where employees of Defendant NCIA during the time of the alleged sexual harrasment.

259. Defendant Hack was the Operational Supervisor for the Day Program and the Immediate Supervisor to the Plaintiff.

260. Defendant Gessner was the Director of Human Resources and had the authority to manage, supervise, discipline and terminate Defendant Hack and Plaintiff.

261. Defendant Hack's conduct towards Plaintiff constituted sexual harassment that Defendant Gessner was apprised of by the Plaintiff and knew or should have known of the harrasment the Plaintiff experienced at the hands of the Defendant Hack.

262. Defendant Gessner failed to take immediate, appropriate and sufficient action to prevent, and stop the sexual harassment by Defendant Hack towards the Plaintiff.

263. On several ocassions between the years of 2007 and 2011, Plaintiff informed Defendant Gessner about the sexual harassment by Defendant Hack and Defendant Gessner did not take sufficient action at all to prevent Defendant Hack's harassment of Plaintiff.

264. Defendant Gessner allowed Defendant Hack to create a hostile work environment in which the Plaintiff was subjected to unwelcome verbal or physical sexual behavior, including allowing Defendant Hack to call her "Baby", "a piece of shit", relay sexual dreams and fantasies about the Plaintiff to the Plaintiff and other employees, as well as other conduct of a sexual nature that was so severe and pervasive that it adversely affected the Plaintiff's ability to do her work.

265. Each and every act of harassment by Defendant Hack was unwelcomed conduct and was based on the Plaintiff's sex as was known by Defendant Gessner.

266. Defendant Hack's conduct was severe or pervasive enough that it created a work environment that a reasonable person would consider intimidating, hostive or abusive.

267.    The Plaintiff was intimidated and felt that her work environment was hotile and abusive.

268.    As a direct and proximate result of Defendant Gessner's lack of actions to prevent and/or stop the sexual harassment by Defendant Hack described herein, Plaintiff has suffered from a loss of income and benefits, severe emotional distress and mental anxiety, nightmares, and fear of being touched secually by Defendant Hack for all of which she should be compensated.

### Count V
### Sexual Harassment
### (Defendant Rodney Norris)

269.    Plaintiff reiterates, re-alleges, and incorporates herein by reference each and every allegation contained in paragraphs 1-268 inclusive.

270.    The actions of Defendant Norris constitute sex discrimination against the Plaintiff, in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-2 (a) (1), which makes unlawful discrimination against employees on the basis of sex.

271.    Sex discrimination includes sexual harassment. The actions of Defendant Norris constitutes one type of sexual harassment, which holds employers vicariously liabile for the acts of sexual harassment in the workplace by an employee.

272.    The Plaintiff, Defendant Hack and Defendant Norris are employees within the meaning of Title VII, 42 U.S.C. § 2000-e (f).

273.    The Plaintiff, Defendant Hack and Defendant Norris where employees of Defendant NCIA during the time of the alleged sexual harrasment.

274.    Defendant Hack was the Operational Supervisor for the Day Program and the Immediate Supervisor to the Plaintiff.

36

275.    Defendant Norris was the Executive Director of the Day Program and the immediate manager to Defendant Billips, the Operational Manager and the immediate manager to Defendant Hack and had the authority to manage, assign work, supervise, discipline and terminate the Plaintiff and Defendant Hack.

276.    Defendant Hack's conduct towards the Plaintiff constituted sexual harassment that Defendant Norris knew or should have known of.

277.    Defendant Norris failed to take immediate, reasonable and sufficient action to prevent, and stop Defendant Hack's sexual harassment by Defendant Hack.

278.    On several ocassions between the years of 2007 and 2011, Plaintiff informed Defendant Norris Defendant Hack's sexual harassment of the Plaintiff.

279.    Defendant Norris dicisplined nor repremanded Defendant Hack for his actions.

280.    The Defendant NCIA created or allowed the creation of a hostile work environment in that the Plaintiff was subjected to unwelcome verbal or physical sexual behavior, including allowing Defendant Hack to call her "Baby", "a piece of shit", relay sexual dreams and fantasies about her to the Plaintiff and other conduct of a sexual nature that was so severe and pervasive that it adversely affected her ability to do her work.

281.    Each and every act of harassment by Defendant Hack was unwelcomed conduct and was based on the Plaintiff's sex which was known by Defendant Norris.

282.    Defendant Hack's conduct was severe or pervasive enough that it created a work environment that a reasonable person would consider intimidating, hostive or abusive.

283.    The Plaintiff was intimidated and felt that her work environment was hotile and abusive.

37

284.    As a direct and proximate result of Defendant Norris's lack of actions to prevent and/or stop the sexual harassment by Defendant Hack described herein, Plaintiff has suffered from a loss of income and benefits, severe emotional distress, mental anxiety and nightmares for all of which she should be compensated.

**Count VI**
**Sexual Harassment**
**(Defendant Herbert J. Hoelter)**

285.    Plaintiff reiterates, re-alleges, and incorporates herein by reference each and every allegation contained in paragraphs 1-284 inclusive.

286.    The actions of Defendant Hoelter constitute sex discrimination against the Plaintiff, in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-2 (a) (1), which makes unlawful discrimination against employees on the basis of sex.

287.    Sex discrimination includes sexual harassment. The actions of Defendant Hoelter constitutes one type of sexual harassment, which holds employers vicariously liabile for the acts of sexual harassment in the workplace by an employee.

288.    Each and every act of harassment by Defendant Hack was unwelcomed conduct and was based on the Plaintiff's sex which was known by Defendant Hoelter.

289.    Defendant Hack's conduct was severe or pervasive enough that it created a work environment that a reasonable person would consider intimidating, hostive or abusive.

290.    The Plaintiff was intimidated and felt that her work environment was hotile and abusive.

291.    Defendant Hoelter is an employer witin the meaning of Title VII, 42 U.S.C. § 2000-e (b).

292.    The Plaintiff and Defendant Hack are employees within the meaning of Title VII, 42 U.S.C. § 2000-e (f).

293.    The Plaintiff and Defendant Hack where employees of Defendant NCIA and Hoelter during the time of the alleged sexual harrasment.

294.    Defendant Hack was the Operational Supervisor for the Day Program and the Immediate Supervisor to the Plaintiff.

295.    Defendant Hoelter is the CEO, Co-Founder and Chairman of NCIA and had the authority to supervise, manage, assign work, discipline and terminate Defendant Hack and the Plaintiff.

296.    Defendant Hack conducts towards Plaintiff constituted sexual harassment that Defendant Hoelter knew or should have known of.

297.    Defendant Hoelter failed to take immediate, appropriate and sufficient action to prevent, and stop the sexual harassment by Defendant Hack towards the Plaintiff.

298.    On several ocassions between the years of 2007 and 2011, Plaintiff informed several persons within managerial positions about the sexual harassment by Defendant Hack.

299.    Furthermore, On October 18, 2010 Plaintiff specifically informed Defendant Hoelter about the sexual harassment by Defendant Hack.

300.    Defendant Hoelter failed to prevent and elemiminate the sexual harassment towards the Plaintiff by Defendant Hack.

301.    Defendant Hoelter never seriously dicisplined nor repremanded Defendant Hack for his actions.

302.    The Defendant NCIA created or Defendant Hack to create a hostile work environment in that the Plaintiff was subjected to unwelcome verbal or physical sexual behavior,

39

including allowing Defendant Hack to call her "Baby", "a piece of shit", relay sexual dreams and fantasies about her to the Plaintiff and other conduct of a sexual nature that was so severe and pervasive that it adversely affected her ability to do her work.

303.    As a direct and proximate result of Defendant Hoelter's lack of actions to prevent and/or stop the sexual harassment by Defendant Hack described herein, , Plaintiff has suffered from a loss of income and benefits, severe emotional distress, high blood pressure, mental anxiety and nightmares, for all of which she should be compensated.

**Count VII**
**Pregnancy Discrimination**
**Pregnancy Discrimination Act of 1978**
**(NCIA and Defendant James Hack)**

304.    Plaintiff reiterates, re-alleges, and incorporates herein by reference each and every allegation contained in paragraphs 1-303 inclusive.

305.    The actions of Defendant Hack constitute sex discrimination against Plaintiff, in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-2(a)(1), which makes unlawful discrimination against employees on the basis of sex.

306.    Sex discrimination includes discrimination on the basis of pregnany in violation of the Pregnancy Discrimination Act of 1978. The actions of Defendant Hack constitutes pregnancy discrimination, which creates an offensive and/or hostile work environment

307.    The Plaintiff and Defendant Hack are employees within the meaning of Title VII, 42 U.S.C. § 2000-e (f).

308.    The Plaintiff and Defendant Hack where employees of Defendant NCIA during the time of the alleged sexual harrasment.

309.    Defendant Hack was the Operational Supervisor for the Day Program and the Immediate Supervisor to the Plaintiff.

40

310.   In May 2009, while Plaintiff was seven months pregnant Plaintiff was subject to harassment and unfair treatment by Plaintiff's supervisor, Defendant Hack.

311.   Defendant Hack refused to accommodate the Plaintiff with a cushioned chair even though the Plaintiff was suffering great pain from being seven months pregnant and having fibroids.

312.   Defendant Hack allowed Ms. Delores solely to sit in the chair who was not pregnant or suffering from a painful ailment.

313.   As a result of the Plaintiff being pregnant and also suffering from fibroids, the Plaintiff frequently needed to use the restroom.

314.   Defendant Hack on several ocassions refused to accommodate the Plaintiff in allowing her to use the restroom when it was necessary.

315.   Defendant Hack refused to allow the Plaintiff to use the restroom at a nearby restaurant eventhough the one and only restroom in the warehouse shared by more than one hunded people was unsanitary and unsafe as a client with behavioral issues smeared feces over the entire restroom.

316.   In May 2009, while Plaintiff was pregnant, Defendant Hack harassed and treated Plaintiff unfairly because of Plaintiff's pregnanacy.

317.   Each and every act of harassment by Defendant Hack was unwelcomed conduct and was based on the Plaintiff's sex and pregnancy.

318.   Defendant Hack's conduct was severe or pervasive enough that it created a work environment that a reasonable person would consider intimidating, hostive or abusive.

319.   The Plaintiff was intimidated and felt that her work environment was hotile and abusive.

320. As a direct and proximate result of Defendant Hack's actions described herein, Plaintiff has suffered from a loss of income and benefits, severe emotional distress, mental anxiety, high blood pressure, sleepless nights for all of which she should be compensated.

**Count VIII**
**Retaliation**
**(Defendant National Center Institution Alternatives)**

321. Plaintiff reiterates, re-alleges, and incorporates herein by reference each and every allegation contained in paragraphs 1-320 inclusive.

322. The actions of Defendant NCIA constitute retaliation against the Plaintiff, in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-3 (a), which makes unlawful retaliation against employees for opposing an unlawful employment practice.

323. The Plaintiff engaged in protected activity by reporting and helping to report to the EEOC the sexual harassment of her supervisor, Defendant Hack.

324. The Plaintiff was terminated one month after she submitted a rebuttal to Defendant's response to Plaintiff's sexual harassment claim illegally terminating the Plaintiff in retaliation of her filing the EEOC claim.

325. The reason Defendant NCIA gave for terminating the Plaintiff's employment status was that Plaintiff's student was no longer in the program and there were no other positions available.

326. While working at the YIT School, Plaintiff worked as an IEP Aid and a Van Aid. While Plaintiff's student was no longer at the school, the Plaintiff still conducted her duties as a

Van Aid as well as other duties assisting other teachers at the school and did not require being terminated.

327. It was the policy of Defendant NCIA to rehire senior employees when positions became available. Defendant NCIA did not contact or rehire the Plaintiff when positions became available.

328. The Plaintiff was in good standing for her employment status and had no disciplinary actions or unsatisfactory complaints against her.

329. Plaintiff's protected activity and her termination is causally related.

330. The termination took place about a month after she submitted a rebuttal to Defendant NCIA's response to Plaintiff sexual harassment claim. Plaintiff had worked for Defendant NCIA for nearly thirteen years, and was suddenly and abruptly terminated because her student was no longer in the program even though the Plaintiff carried another position that did not require her to be assigned a student.

331. Furthermore, Defendant NCIA did not rehire the Plaintiff although Defendant NCIA had a policy of reoffering positions to senior employees when positions became available.

332. Defendant NCIA intentionally, willfully, and wantonly retaliated against Plaintiff in response to her complaints of sexual harassment, in violation of Title VII.

333. As a direct and proximate result of the Defendant NCIA's conduct described herein, Plaintiff has suffered from a loss of income and benefits, severe emotional distress, high blood pressure, and mental anxiety and sleepless nights, for all of which she should be compensated.

## Count IX
### Retaliation
### (Defendant James Hack)

334.    Plaintiff reiterates, re alleges, and incorporates herein by reference each and every allegation contained in paragraphs 1-333 inclusive.

335.    The actions of Defendant Hack constitute retaliation against the Plaintiff, in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-3 (a), which makes unlawful retaliation against employees for opposing an unlawful employment practice.

336.    The Plaintiff engaged in protected activity by reporting and helping to report to several persons within managerial positions about the sexual harassment by her supervisor, Defendant Hack.

337.    The Plaintiff was subject to adverse changes to her work schedule and, thus, her compensation, because she rejected Defendant Hack's advances.

338.    Defendant Hack gave no valid reason for the unwarranted changes in the Plaintiff schedule.

339.    While working at the Day Program, Plaintiff was in good standing for her employment status and had no disciplinary actions or unsatisfactory complaints against her.

340.    Plaintiff's protected activity and the adverse changes to her work schedule are causally related.

341.    Defendant Hack's sudden and unexpected change to Plaintiff schedule took place the day after Plaintiff reported Defendant Hack to Defendant Billips concerning Defendant Hack's actions when he wrongfully kept her from leaving early from work when the Team Leader told the staff members they could leave, and Defendant Hack allowed all of the other coworkers except for the Plaintiff to leave.

342.    Another sudden and unexpected change in Plaintiff's schedule took place the day after Plaintiff complained about the first unexpected and abrupt change in Plaintiff's schedule.

343.    Prior to the retaliatory change in the Plaintiff's schedule, the Plaintiff did not have any problems with scheduling and neither NCIA nor Defendant Hack provided a legal reason to the Plaintiff for suddenly and unexpectedly changing her schedule.

344.    Furthermore, Defendant Hack assigned Plaintiff to a client who had physically assaulted her against NCIA policy. This assignment occurred within close proximity to the Plaintiff again objecting to Defendant Hack's inappropriate and unwelcomed comments.

345.    Defendant Hack intentionally, willfully, and wantonly retaliated against Plaintiff in response to her objections of his sexual harassment towards her, in violation of Title VII.

346.    As a direct and proximate result of the Defendant Hack's conduct described herein, Plaintiff has suffered from a loss of income and benefits, severe emotional distress and mental anxiety, for all of which she should be compensated.

### Count X
### Intentional Infliction of Emotional Distress
### Maryland State Law
### (NCIA and Defendant James Hack )

347.    Plaintiff reiterates, re-alleges, and incorporates herein by reference each and every allegation contained in paragraphs 1-346, inclusive.

348.    Defendant Hack's harassment, discrimination and retaliatory actions directed against Plaintiff were intentional and inflicted upon Plaintiff severe mental and emotional distress.

349.    In the alternative, Defendant Hack's actions constituted negligent infliction of emotional distress, and Plaintiff was hospitalized as a result of Defendant Hack's conduct.

45

350.    Based on repeated harassing behavior outlined in the facts and based on

Defendant Hack having admitted to the behavior in a March 2010 in a meeting with the Plaintiff

and Defendant Billips concerning his harassment of the Plaintiff, as well as other factors,

Defendant Hack's harassment was intentional or reckless.

351.    Defendant NCIA was aware of Defendant Hack's intentional or reckless behavior.

352.    Defendant Hack's conduct was extreme and outrageous.

353.    As a direct and proximate cause of the Defendant Hack's and Defendant NCIA's

extreme and outrageous behavior, the Plaintiff suffered emotional distress and high blood

pressure, which was severe.

354.    As a direct and proximate result of the Defendant Hack's action described herein,

Plaintiff has suffered from a loss of income and benefits, severe emotional distress and mental

anxiety, for all of which she should be compensated.

### Count XI
### Negligent Hiring/Retention
### Maryland State Law
### (NCIA)

355.    Plaintiff reiterates, re-alleges, and incorporates herein by reference each and

every allegation contained in paragraphs 1-354, inclusive.

356.    Defendant Hack's harassment, discrimination and retaliatory actions directed

against Plaintiff were acts known by Defendant NCIA, accepted by NCIA and allowed to occur

repeatedly without any disciplinary actions against Defendant Hack.

357.    Defendant NCIA knew that the Plaintiff was suffering emotionally and mentally

from the harassing act perpetrated by Defendant Hack, but failed to take any reasonable steps to

stop Defendant's Hack's actions.

46

358.    At all relevant times, Defendant was an employee of NCIA and was acting within the scope of his employment when he committed the harassment of the Plaintiff.

359.    Defendant NCIA owed a duty of care to the Plaintiff to prevent any harassment of the Plaintiff under Maryland State Law and under Federal Law, Title VII.

360.    Defendant NCIA failed to provide the duty of care required by law.

361.    As a proximate cause of the Defendant NCIA's breach, The Plaintiff has suffered financially, emotionally, physically and emotionally.

### Count XII
### Wrongful Discharge
### Maryland State Law
### (NCIA)

362.    Plaintiff reiterates, re-alleges, and incorporates herein by reference each and every allegation contained in paragraphs 1-361, inclusive.

363.    The Plaintiff was terminated from her position on April 17, 2013 because she filed an EEOC claim against Defendant NCIA and Defendant HACK.

364.    Defendant NCIA did not provide a legitimate reason for terminating the Plaintiff as the circumstances at the time did not support the reason given for terminating the Plaintiff.

365.    Based on the facts outlined herein, Defendant NCIA terminated the Plaintiff illegally. The Defendant NCIA cannot terminate employees on the grounds of discrimination or harassment, which is a violation of State and Federal Law.

366.    As a proximate cause of the Defendant NCIA's wrongful discharge of Plaintiff, the Plaintiff has suffered financially, emotionally, physically and emotionally.

**WHEREFORE,** Plaintiff demands judgment against the Defendants, individually and severally, as follows:

a.  For back pay with prejudgment interest and all the fringe benefits to which she is entitled;

b.  Front pay and benefits to the extent reinstatement is not feasible;

c.  For compensatory damages for Plaintiff's non-economic injuries in an amount authorized by Title VII and State Law up to 1.5 million dollars;

d.  For an award of reasonable costs and attorneys fees for causing the Plaintiff to prosecute this case; and

e.  For any and all other equitable and legal relief to which Plaintiff appears entitled;

f.  Punitive damages to punish and deter NCIA from future acts of employment discrimination in an amount authorized by Title VII and the State Law.

June 2, 2014

Jessie Lyons Crawford, Esquire (#25247)
Law Office of Jessie Lyons Crawford, LLC
2601 Maryland Avenue
Baltimore, Maryland 21218
Phone: (410) 662-1230
Fax: (410) 662-1238
attorneyjlcrawford@verizon.net
Attorney for Plaintiff

## JURY TRIAL PRAYER

The Plaintiff prays a jury trial on the issues in this case.

Jessie Lyons Crawford, Esquire (#25247)

48



**U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION**
**Baltimore Field Office**

City Crescent Building
10 South Howard St., 3rd Floor
Baltimore, MD 21201
National Contact Center: (800) 669-4000
National Contact Center TTY: (800) 669-6820
Baltimore Status Line: (866) 408-8075
Baltimore Direct Dial: (410) 209-2237
TTY (410) 962-6065
FAX (410) 962-2817/4270

EEOC Charge No.: 531-2011-00193C

Shalelah Cook
9511 Oak Trace Way
Randallstown, Maryland 21133

NCIA
7222 Ambassador Road
Baltimore, Maryland 21244

## DETERMINATION

Under the authority vested in me by the Commission's Procedural Regulation, I issue on behalf of the Commission the following determination on the merits of the subject charge filed under Title VII of the Civil Rights Act of 1964, as amended (hereinafter referred to as "Title VII").

Respondent is an employer within the meaning of Title VII and all requirements for coverage have been met.

Charging Party alleges she was subject to sexual harassment and retaliatory terms and conditions based on her sex (Female) in violation of Title VII. Charging Party claims she became subject to sexual harassment by Mr. James Hack, Supervisor, around 2007 and worsening in 2010. Charging Party alleges she protested Mr. Hack's commentary and advances. Charging Party alleges she complained of sexual harassment in March 2010 to Mr. Walter Billips, Director of CDP, and Ms. Jayne Gessner, Director of HR. After complaining, Charging Party claims she was subject to retaliatory unequal terms and conditions when she suffered change in hours, reassignment and breaks by Mr. Hack.

Respondent denied the allegations and contended no complaint of sexual harassment was received from Charging Party. Respondent contended Charging Party was promoted to Art Teacher on February 1, 2010, and voluntarily resigned on April 11, 2010. Respondent admits documented complaints made by Charging Party were received regarding Mr. Hack's management style. Respondent contends Mr. Hack admitted to calling various employees "baby" and received counseling and retraining as a result. Respondent contended upon Charging Party's return to the position of Job Coach on April 11, 2010, schedule fluctuations were routine and denied the allegation regarding breaks. Respondent denied the allegations of retaliation and contended after Charging Party filed her claim with the EEOC in October 2010, further communication regarding assignments was conducted through Mr. Billips or Mr. Smith. Respondent contended Charging Party was granted a requested transfer on September 26, 2011.

2014 JUN -2 PM 6:09

BALTIMORE-NIGHT BOX

*Exhibit 1*

Determination (cont'd.)
EEOC Charge No.:  531-2011-00193C

Evidence obtained during the Commission's investigation revealed Charging Party complained of sexual harassment by Mr. Hack on numerous occasions between March and May 2010. Further, Charging Party voluntarily resigned from her position as Art Teacher on April 11, 2010, due to the continued inappropriate behavior by Mr. Hack and ultimately transferred to a different location on September 26, 2011. During the course of the investigation, Respondent claimed the alleged sexual harassment and inappropriate behavior by Mr. Hack was addressed. However, no documentary evidence was presented to support the claim of counseling or training provided to Mr. Hack. The record revealed Respondent failed to make a good faith effort to correct the conditions as Charging Party alleged. Further, Respondent was unable to provide an explanation regarding the difference in treatment and adverse employment actions received by Charging Party.

Based on this analysis, I have determined that the evidence obtained during the investigation establishes that Respondent violated Title VII.

Upon finding that there is reason to believe that violations have occurred, the Commission attempts to eliminate the alleged unlawful practices by informal methods of conciliation. Therefore, the Commission now invites the parties to join with it in reaching a just resolution of this matter. In this regard, conciliation of this matter has now begun. Please be advised that upon receipt of this finding, any reasonable offer to resolve this matter will be considered. The Commission can seek an amount inclusive of the applicable cap to your organization for compensatory and/or punitive damages; and actual monetary costs incurred by the Charging Party and aggrieved individuals, if any. A commission representative will prepare and monitor an actual dollar amount to include accruing wage losses and attendant benefits, with interest to date, any appropriate front pay; and, if appropriate, attorney fees and costs which have accrued to date.

If the Respondent declines to discuss settlement or when, for any other reason, a settlement acceptable to the office director is not obtained, the director will inform the Respondent of the court enforcement alternatives available to the Commission.

ON BEHALF OF THE COMMISSION:

1/27/2014
DATE

Rosemarie Rhodes
Director

cc:
Ms. Jayne Gessner
Human Resources Manager
NCIA
7222 Ambassador Road
Baltimore, MD 21244

EEOC Form 161-B (11/09)       U.   EQUAL EMPLOYMENT OPPORTUNITY CO.....SSION

## NOTICE OF RIGHT TO SUE *(ISSUED ON REQUEST)*

| | |
|---|---|
| To:  Shalelah Cook<br>9511 Oak Trace Way<br>Randallstown, MD 21133 | From:  Baltimore Field Office<br>10 South Howard St<br>3rd Floor<br>Baltimore, MD 21201 |

| | On behalf of person(s) aggrieved whose identity is<br>CONFIDENTIAL (29 CFR §1601.7(a)) |
|---|---|

| EEOC Charge No. | EEOC Representative | Telephone No. |
|---|---|---|
| 531-2013-00696 | L Corinne Kienzle,<br>Investigator | (410) 209-2217 |

*(See also the additional information enclosed with this form.)*

NOTICE TO THE PERSON AGGRIEVED:

**Title VII of the Civil Rights Act of 1964, the Americans with Disabilities Act (ADA), or the Genetic Information Nondiscrimination Act (GINA):** This is your Notice of Right to Sue, issued under Title VII, the ADA or GINA based on the above-numbered charge. It has been issued at your request. Your lawsuit under Title VII, the ADA or GINA must be filed in a federal or state court <u>WITHIN 90 DAYS</u> of your receipt of this notice; or your right to sue based on this charge will be lost. (The time limit for filing suit based on a claim under state law may be different.)

[X]   More than 180 days have passed since the filing of this charge.

[ ]   Less than 180 days have passed since the filing of this charge, but I have determined that it is unlikely that the EEOC will be able to complete its administrative processing within 180 days from the filing of this charge.

[X]   The EEOC is terminating its processing of this charge.

[ ]   The EEOC will continue to process this charge.

**Age Discrimination in Employment Act (ADEA):** You may sue under the ADEA at any time from 60 days after the charge was filed until 90 days after you receive notice that we have completed action on the charge. In this regard, the paragraph marked below applies to your case:

[ ]   The EEOC is closing your case. Therefore, your lawsuit under the ADEA **must be filed in federal or state court <u>WITHIN 90 DAYS</u> of your receipt of this Notice.** Otherwise, your right to sue based on the above-numbered charge will be lost.

[ ]   The EEOC is continuing its handling of your ADEA case. However, if 60 days have passed since the filing of the charge, you may file suit in federal or state court under the ADEA at this time.

**Equal Pay Act (EPA):** You already have the right to sue under the EPA (filing an EEOC charge is not required.) EPA suits must be brought in federal or state court within 2 years (3 years for willful violations) of the alleged EPA underpayment. This means that backpay due for any violations that occurred <u>more than 2 years (3 years)</u> before you file suit may not be collectible.

If you file suit, based on this charge, please send a copy of your court complaint to this office.

On behalf of the Commission

*Judy W. Cassell for*                               3/7/2014

**Rosemarie  Rhodes,**                          *(Date Mailed)*
**Director**

Enclosures(s)

cc:    Mr. Douglas W. Desmarais, Esq.
Smith & Downey, P.A.
One W. Pennsylvania Avenue
Suite 950
Baltimore, MD 21204

*Exhibit 2*